Filed 1/20/21  V.A. v. Super. Ct. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| V.A., | |
| Petitioner, | E076079 |
| v. | (Super.Ct.No. RIJ1900213) |
| THE SUPERIOR COURT OF RIVERSIDE COUNTY, | OPINION |
| Respondent; | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | |
| Real Party in Interest. | |

ORIGINAL PROCEEDINGS; petition for extraordinary writ.  Matthew C.

Perantoni, Judge.  Petition denied.

Office of Juvenile Defense Panel and Anastasia M. Georggin for Petitioner.

No appearance for Respondent.

1

Gregory P. Priamos, County Counsel, James E. Brown, Anna M. Marchand and Prabhath D. Shettigar, Deputy County Counsel, for Real Party in Interest.

The juvenile court terminated petitioner V.A.'s (mother) reunification services and set the Welfare and Institutions Code section 366.26 hearing.[1] On petition for extraordinary writ, mother contends personnel from real party in interest, Riverside County Department of Public Social Services (department), failed to provide her with reasonable services, and the juvenile court erred in terminating her reunification services. The petition is denied.

## I.  FACTUAL AND PROCEDURAL HISTORY

Department personnel received an immediate response referral on March 1, 2019, alleging severe neglect resulting in the demise of mother's newborn child.  Mother had given birth to a girl at home in the toilet.  Neither mother nor the baby's father[2] (collectively parents) removed the baby from the toilet until medical personal arrived. Parents said they did not know mother was pregnant.  Mother and the deceased child were taken to the hospital, where mother admitted using methamphetamine, cocaine, and marijuana a week before giving birth.

Mother said she delivered the child in the toilet around 7:30 a.m. and called the paramedics around 8:20 a.m.  Mother "opened her legs to confirm that a baby was in the toilet, and when she saw it, she closed her legs back, and didn't get up."  Father said the

---

[1]  All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2]  Father is not a party to the appeal.

2

baby did not appear to have any signs of life.  The maternal grandfather said no one attempted to care for the child or check if she was alive.

Mother tested positive for methamphetamine and marijuana.  The social worker spoke with the maternal grandmother (MGM), who said she was the primary caregiver for mother's three living children, despite the fact that mother also lived in the home.[3] The social worker developed an action plan in which the children would be in the maternal grandparents' custody; they agreed not to leave the children alone with mother due to her substance abuse issues.  The maternal grandparents agreed to provide mother with substance abuse treatment referrals the social worker had given them.[4]

On March 4, 2019, the social worker returned to the maternal grandparents' home; the MGM said mother had been released from the hospital on March 2, 2019, but was not home.  The MGM did not know mother's whereabouts.  Mother did not initially return home when released from the hospital; however, the MGM said she had given the substance abuse treatment referrals to mother.

On March 5, 2019, the social worker again returned to the home.  She spoke with mother, who said she lived with her parents and was unemployed.  Mother said the MGM cooks and shops for the children as mother did not know how to do those things.  She

_____

[3] Mother's three living children are M.G. (born Sept. 2011), E.G. (born Apr. 2013), and E.A. (born May 2018) (collectively the children).  Reunification services for mother as to only E.A. (the child) is the subject of this petition.  J.C. is the father of the child.  J.G., who is likewise not a party to the petition, is the father of the two older children.

[4] The social worker's initial attempt to speak with mother at the hospital was unsuccessful as mother was incoherent.

3

reported that the older two children's father went to prison for domestic violence against her. Mother said she started smoking marijuana at age 15 and escalated to using methamphetamine and cocaine. She reported that she took a pregnancy test six weeks earlier, which reflected that she was pregnant; however, she did not believe the results. With respect to her drug use, mother said, "'I didn't use all the time, just about 10 times a week, but I didn't smoke all day. I would smoke and little, then go back and smoke some more.'"

Mother submitted to an on-demand saliva test, which was inconclusive for methamphetamine and amphetamines. The social worker provided her with a referral for an on-demand urine test; mother tested positive for cannabinoids and alcohol on March 5, 2019.

On April 4, 2019, the social worker returned to the home where mother confirmed she had scheduled an intake appointment at a substance abuse clinic for April 9. Mother reported she had smoked marijuana once or twice since giving birth but denied using any other substances. She failed to show for her intake appointment. Mother made another intake appointment for which she also failed to show. She reported using marijuana to cope with anxiety and depression. The social worker gave mother referrals to behavioral health.

Mother had a prior history with the department, which included four cases resulting in unfounded allegations and one case with substantiated allegations. Mother's criminal history included convictions for assault causing great bodily injury, burglary, and theft.

Department personnel filed a juvenile dependency petition alleging, as to mother, that she had a history of abusing controlled substances (b-1), suffered from unresolved mental health issues (b-3), was living a transient lifestyle (b-5), had a criminal history (b-6), had a history of domestic violence (b-9), and abused controlled substances throughout her pregnancy resulting in the death one of her children (f-1).[5] On April 24, 2019, the court detained the children.

In the jurisdiction and disposition report filed May 10, 2019, the social worker recommended the court find the allegations true, remove the children from mother's custody, and provide her with reunification services. On April 24, 2019, M.G. and E.G. were placed with their father. On the same date, the child was placed with a maternal aunt. Father reported that he did not want to be involved in the dependency proceedings.

Mother's service objectives included complying with medical or psychological treatment; staying free from drugs; showing an ability and willingness to have custody of the children; meeting the children's physical, emotional, medical, and educational needs; and not behaving in a threatening way with the fathers in the presence of the children. Mother's proposed case plan included a psychological evaluation, a domestic violence program, individual therapy, medication support services, substance abuse treatment, and substance abuse testing. At the jurisdiction and disposition hearing on June 18, 2019, the court found all allegations against mother true, removed the child from parents' custody,

---

[5] Subsequent amendments struck the allegations against the father of M.G. and E.G., reclassified the domestic violence allegation against mother from b-9 to b-8, added an allegation against the child's father, who he was incarcerated (g-1), and struck the f-1 allegation.

placed M.G. and E.G. in their father's custody, and granted mother reunification services pursuant to the proposed case plan.

In the six-month status review report filed November 27, 2019, the social worker recommended mother be provided six additional months of reunification services. Father had been sentenced to jail for infliction of corporal injury to a spouse.[6] Mother had tested negative for drugs on August 27, September 6, and October 29, and she had completed intensive outpatient substance abuse classes on November 25. She was expected to start an outpatient aftercare program after receiving her certificate of completion.

Mother had completed a parenting program on July 17, 2019, and an anger management program on November 14; she had been participating in weekly individual therapy; and had consistently engaged in twice weekly, supervised visitation with the child. Her case plan required that she be assessed for the "most appropriate" substance abuse treatment program (outpatient or inpatient) available to address her needs.

At the hearing on December 11, 2019, the court continued reunification services for mother. The court informed mother, "So, ma'am, you are going to do a home evaluation of your house to see if it is okay to have your child on unsupervised visits." The court directed department personnel to conduct the home evaluation within a week.

In the 12-month review report filed May 22, 2020, the social worker recommended mother receive an additional six months of services. Mother had been arrested on March 20 for felony infliction of corporal injury after an incident with father.

---

[6] It is unclear from the record whether mother was the victim of the injury.

Department personnel had been "unable to complete a home evaluation as the mother and maternal grandmother have been unwilling to set up a scheduled date and time to complete the home evaluation." Shortly after the last hearing, mother stopped taking her prescribed medication, but she was currently "back on" her medication.

Mother started substance abuse aftercare services on December 4, 2019. She was actively participating until the services were decreased and then held only via online audio conference due to COVID-19 restrictions. She continued participating biweekly in individual therapy. Mother consistently visited the child but was late on occasion and had fallen asleep during some visits. The caregiver reported that when mother "is alert, she is very attentive and active." However, since COVID-19, online audio conference visits had begun, and mother was "distracted and inconsistent." She would sometimes darken her screen because she said she did not want the child to know how she looked. The case plan continued to require that mother be assessed for the most appropriate substance abuse treatment program.

On June 4, 2020, the court ordered mother to submit to a hair follicle drug test and ordered department personnel to put her on a regular, random drug test schedule. The court also ordered department personnel to conduct a home evaluation regarding the potential liberalization of visitation.

In an addendum report filed July 15, 2020, the social worker noted that mother had failed to complete the hair follicle test. The social worker also reported that "on June 4, 2020, June 9, 2020, June 18, 2020, June 23, 2020, and July 13, 2020, efforts were made to contact the mother and schedule" a home evaluation. "The department has left

7

voicemails, sent text messages, mailed letters to the home, called and left messages on the maternal grandmother's phone and verified her contact information with the caregiver as well, in efforts to contact and schedule" a home evaluation. "To date, the mother has not made contact with the department."

No formal charges had been filed in mother's criminal case. During online audio conference visits with the child, a man appeared in the background and appeared interested in the child as if he was the child's father. At the 12-month hearing on July 20, 2020, the court approved mother's case plan, found substantial risk of detriment to return custody of the child to mother, and set the matter for an 18-month review hearing.

In the 18-month status review report filed on October 6, 2020, the social worker recommended the court terminate mother's reunification services. Mother was living in the maternal grandmother's home with father, with whom she was in a relationship. Mother had not maintained contact with the department so it was unknown if she had been participating in services. Since mother had still failed to report for the hair follicle test ordered by the court on June 4, the social worker placed her on random drug testing. Mother had yet to test.

The social worker noted that "[d]uring this reporting period, the social worker had contact with the parents on July 23, 2020, August 17, 2020, August 19, 2020, . . . August 21, 2020, September 14, 2020, September 17, 2020, and September 29, 2020, to address their current situation and visitation with the child." The social worker also noted that mother continued to have unresolved substance abuse issues, she had not made

8

any progress on her case plan during this reporting period, and it was unclear if she could provide for the child.

An addendum report filed October 22, 2020, contained the social worker's service logs between July 15 and October 21, 2020. The July 23, 2020 entry reflects that the caregiver reported that mother continuously wanted to change the times scheduled for visits. She would call 30 to 40 minutes after the scheduled video chats. Sometimes she would put on music and leave in the middle of the visits. The August 3, 2020 entry reflects that the social worker left a voicemail and mailed a letter to mother. The letter indicated the social worker had made several, unsuccessful attempts to contact mother. The social worker asked mother to call the social worker for an update regarding mother's progress on her case plan and for directions on how to complete the hair follicle drug test.

The August 21, 2020 entry reflects that mother called 45 minutes late for that day's visit, and she missed visits during the two prior weeks. The September 17 entry reflects that mother called 40 minutes late for that visit. The September 29 entry reflects that the social worker called mother and left a voicemail requesting a return call. That same day, the social worker sent a letter virtually identical to the previous one.

An addendum report filed November 3, 2020, contained the social worker's service logs between October 1 and November 2. The October 21 entry reflects that the social worker called all telephone numbers on file for mother but was unable to leave a message. The social worker called the MGM and left a voicemail requesting a return call from mother. On October 22, the MGM returned the social worker's call. The social

9

worker asked if mother was present, the MGM said mother would be there in a few minutes, and the social worker asked the MGM to have mother call her back.[7]

On October 23, 2020, mother visited with the child while the social worker was present. The social worker recounted that mother "was appropriate and trying to engage [the child] in singing and she was playing with toys." The caregiver reported that during a visit a week earlier via online audio conferencing, mother was arguing with a man in the background.

On October 26, 2020, the social worker called mother and left a voicemail requesting a return call to discuss mother's case plan. On October 30, the social worker called mother again and left another voicemail. The social worker also called the MGM and left a voicemail requesting a return call.[8] On November 2, the social worker called mother and left a third voicemail requesting a return call. The social worker then called and spoke with the MGM regarding her efforts to contact mother. The MGM said mother would be home later, and the social worker asked the MGM to have mother return her call.[9]

Mother testified by telephone at the 18-month review hearing on November 5, 2020. She said she had completed a parenting program on July 17, 2019, a nurturing parenting

---

[7] The service logs do not reflect if mother ever called the social worker back.

[8] The entry cryptical reads, "Called maternal grandmother number as well of efforts to contact [mother] no answer. Left a voicemail requesting a return call."

[9] The service logs, again, do not reflect if mother ever returned the social worker's call.

program on December 18, 2019, a substance abuse program on November 25, 2019, an anger management program on November 14, 2019, and an individual therapy program.

Mother had enrolled in an outpatient aftercare program for substance abuse around December 4, 2019, which she participated in until COVID-19 restrictions "closed their building." She stated that she did not participate "via video" because it "was a voluntary program that [she] was volunteering for." However, she stated that she had been attending Narcotics Anonymous meetings every Friday since August. Mother also said she was taking Alprazolam for her anxiety and admitted taking an "at home" drug test. The test results were positive for benzodiazepines and opiates, which mother said were from her prescribed medication. She also admitted that he did not share the results with the department because she had not talked to the social worker.

Mother continued to visit with the child and was living with the MGM and no one else. Mother was prepared to provide everything necessary for the child in order to take him back into her custody. She loved the child and was bonded with him. The child showed her love and affection, and he called her "mom."

Mother testified that the current social worker discussed her case plan with her in April 2020. However, she had not had any contact with the social worker since their initial meeting, "besides our phone conversations, which was twice." The social worker had maintained contact with her, "[b]arely, through letters, and they have been spread very wide." Mother was never provided with services by the current social worker. She had contact with her previous social worker in March 2020; however, that social worker did not go over any details of her case plan.

11

Mother also testified that she had never received a letter dated August 3, 2020; she did not believe she had received a September 29, 2020 letter either; but, she did admit receiving a letter dated June 14, 2020, "on July 14th."

In the letter mother did receive, she said the social worker had requested she drug test, but did not send her information on where or when to test. The social worker never reached out to her regarding a hair follicle drug test, and mother did not know she had to submit one. To mother's recall, the letter did not mention medication monitoring, and the social worker never provided mother with any random drug test referrals.

Regarding letters from the social worker, mother testified she "received them in July, and then recently, like, maybe two weeks ago, again, like a week—I think it was the day of my last court date—or, I'm sorry, the 20th of October and recently yesterday." The letter she received about two weeks earlier did not inquire about medication monitoring, counseling, or drug testing. All the letter reflected was that her parenting services were going to be "possibly terminated." She did not actually read the letter; the MGM read it to her over the phone. Mother admitted receiving a letter the day before the hearing, which sought information regarding her medication compliance.

Mother did not believe the social worker had maintained contact with the MGM. However, in later testimony, when mother was asked, "Do you recall your mother ever telling you that she had received phone calls from your social worker requesting that you contact that social worker?," mother answered, "[Y]es."

Mother further testified that she had never received letters from the social worker regarding setting up a home evaluation and stated: "[We were] going to do a home

12

evaluation, and they never came by my house.  Like, me and my mom are home every day, all day, and nobody has been by my house."

Mother admitted that she had never reached out to the social worker, called her back, or responded to the letters.  She did not contact the social worker because she did not "agree with her, the way she does her job.  And I don't—I don't mean to be judgmental, but I don't agree with her.  I don't feel like she's trying to help me.  I feel that she's trying to sabotage me."  "I haven't contacted her because I don't want to talk to her."  Mother did not believe the social worker had provided her with reasonable services.

The social worker testified that she had been mother's social worker since around August 2019, mother started aftercare substance abuse services in December 2019.  However, the social worker did not know if mother had met any of her remaining case plan requirements because she had no recent contact with mother.  The last time the social worker met with mother was around February 2020, and the last time she had spoken with her was around May 2020.

Mother still had to complete the medication monitoring, counseling, and aftercare components of her case plan, and the social worker had not received a certificate of completion for the individual therapy component of the case plan.  Also, mother had never submitted to a hair follicle test, which was ordered by the court.[10]  Mother was referred to random drug testing, but she never completed any tests.

---

[10]  However, the social worker testified she did not send out a letter with a specific time and location in order for mother to submit to the hair follicle test.

The social worker attempted to contact mother on July 23, August 17, 19, and 21, and September 14, 17, and 29, 2020. She called mother at two different phone numbers and was able to leave messages for her at one of them. Mother never returned any of the phone calls. The social worker sent letters to mother regarding her case plan, but she never received a response from mother. A home evaluation was never conducted because mother and the MGM refused to cooperate. Mother had missed some visitation and never moved to unsupervised visitation.

Thereafter, both mother's and the child's counsels argued that the social worker had failed to provide reasonable services and urged the court to continue reunification services for mother. The court found the social worker's testimony credible. The court found the department had provided mother with reasonable services: "I heard a case where the social worker tried to, it seems ad nauseam, to get mother's attention and to get her to cooperate." "I heard from—the mother said that she wasn't going to cooperate with the social worker and give her any information. She basically shut down. I don't know how to overcome that. The social worker in the Court's opinion attempted to engage mother in finding out what she was doing as to services, wanted to speak with her to let her know what was expected of her, and mother simply would not cooperate with the social worker." "I do believe that the Department made every reasonable attempt to provide services and attempt to get mother to cooperate with them. Mother is just unfortunately in a very different place." The court found that mother's progress was minimal.

The court also found that there was a substantial risk of detriment if the child was returned to mother's custody: "We still don't have a home evaluation of the mother due to what the Court believes is the noncooperation of mother." The court terminated mother's reunification services: "I would point out that the child was under the age of three when the child was detained, and this originally was only supposed to be a six-month case. And, we have gone onto what is at this point past 18 months." The court set the section 366.26 hearing.

## II. DISCUSSION

### A. *Reasonableness of Reunification Services*

Mother contends the department failed to provide her with reasonable reunification services. Specifically, mother argues the social worker failed to maintain sufficient contact with mother regarding her service plan requirements during the last reporting period. We disagree.

"'The paramount goal in the initial phase of dependency proceedings is family reunification. [Citation.]' [Citation.] 'At a disposition hearing, the court may order reunification services to facilitate reunification between parent and child.' [Citation.] Reunification services must be 'designed to eliminate those conditions that led to the court's finding that the child is a person described by Section 300.' [Citation.] Accordingly, a reunification plan must be appropriately based on the particular family's 'unique facts.'" (*In re T.G.* (2010) 188 Cal.App.4th 687, 696.)

The department "'must make a good faith effort to develop and implement a family reunification plan. [Citation.] "[T]he record should show that the supervising

15

agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained reasonable contact with the parents during the course of the service plan, and made reasonable efforts to assist the parents in areas where compliance proved difficult . . . ." [Citation.]' [Citation.] 'The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances.' [Citation.] 'The applicable standard of review is sufficiency of the evidence.'" (*In re T.G.*, *supra*, 188 Cal.App.4th at p. 697.)

Here, sufficient evidence supports the juvenile court's finding that the department provided reasonable reunification services. Mother's initial case plan included a psychological evaluation, a domestic violence program, individual therapy, medication support services, substance abuse treatment, and substance abuse testing. By the 12-month mark, mother had completed much of those services; however, she was still expected to participate in an outpatient aftercare substance abuse program, to submit to a hair follicle drug test, to submit to random drug tests, comply with medication monitoring, submit to a home evaluation, and continue to participate in individual counseling. Mother failed to complete any of the remaining components of her case plan, largely because she was determined not to communicate with the social worker.

Even prior to the 12-month review report, mother had begun to make herself unavailable to the social worker so that the social worker was unable to provide mother support for completing her case plan. The social worker noted in the 12-month review report that the department had been "unable to complete a home evaluation as the mother

16

and maternal grandmother have been unwilling to set up a scheduled date and time to complete the home evaluation."

In an addendum report after the 12-month report, the social worker reported that "on June 4, 2020, June 9, 2020, June 18, 2020, June 23, 2020, and July 13, 2020, efforts were made to contact the mother and schedule" a home evaluation. "The department has left voicemails, sent text messages, mailed letters to the home, called and left messages on the maternal grandmother's phone and verified her contact information with the caregiver as well, in efforts to contact and schedule" a home evaluation. "To date, the mother has not made contact with the department." The social worker testified that a home evaluation was never conducted because mother and the MGM refused to cooperate.

The social worker testified she attempted to contact mother on July 23, August 17, 19, and 21, and September 14, 17, and 29. She called mother at two different phone numbers and was able to leave messages for her at one of them. Mother never returned any of the phone calls. The social worker sent letters to mother regarding the case plan, but she never received a response from mother.

On August 3, 2020, the social worker left a voicemail and mailed a letter to mother. The letter indicated that the social worker had made several, unsuccessful attempts to contact mother. The social worker asked mother to call her for an update regarding any progress on her case plan and to complete a hair follicle drug test. On September 29, the social worker called mother and left a voicemail requesting a return call. The social worker also sent a letter virtually identical to the previous letter she had

sent. On October 21, the social worker called all the telephone numbers on file for mother, but she was unable to leave any messages. The social worker also called the MGM and left a voicemail requesting a return call from mother. On October 22, the MGM returned the social worker's call. The social worker asked the MGM if mother was present, the MGM said mother would be there in a few minutes, and the social worker asked the MGM to have mother call her back.

On October 26, 2020, the social worker called mother and left a voicemail requesting a return call regarding her case plan. On October 30, the social worker called mother again and left a voicemail requesting a return call. The social worker also called the MGM and left a voicemail requesting a return call. On November 2, the social worker called mother and left a voicemail requesting a return call. The social worker then called and spoke with the MGM regarding her efforts to contact mother, the MGM said mother would be home later, and the social worker asked the MGM to have mother return the call.

Mother testified she never reached out to the social worker, called her back, or responded to the letters: "I haven't contacted her because I don't want to talk to her." Sufficient evidence supports the juvenile court's finding that the social worker could not provide support for mother's completion of her case plan if mother refused to maintain any contact with the social worker.

Even if we were to assume that the provision of reasonable services would require that the social worker provide mother with a place and time to submit to both the hair follicle and random drug testing, and that mother would have submitted to them, and that

18

she would have tested negative, mother would still have failed to complete the other aspects of her case plan. Moreover, considering mother's history of noncooperation, it is reasonable to infer that she would not have submitted to drug tests even if provided with the dates, times, and locations. Furthermore, it was reasonable for the social worker to require mother to contact her before providing dates, times, and locations for drug tests. The court's finding that the department had provided mother reasonable services is supported by substantial evidence.

### B. Termination of Reunification Services

Mother contends the juvenile court abused its discretion by terminating her reunification services. We disagree.

"'If the child may not safely be returned to the parents within a maximum of 18 months from removal, the court must develop a permanent plan for the child. Prior to terminating reunification services, the court must make a determination that it would be detrimental to the child to be returned to the parent's custody.'" (*M.G. v. Superior Court* (2020) 46 Cal.App.5th 646, 660.) "[T]he risk of detriment must be *substantial*, such that returning a child to parental custody represents some danger to the child's physical or emotional well-being." (*In re Yvonne W.* (2008) 165 Cal.App.4th 1394, 1400; see *In re C.C.* (2009) 172 Cal.App.4th 1481, 1490 [same]; *In re E.D.* (2013) 217 Cal.App.4th 960, 965 [same]; *David B. v. Superior Court* (2004) 123 Cal.App.4th 768, 789 [same].) "That standard is construed as a fairly high one. [Citation.] It does not mean the parent in question is less than ideal, did not benefit from reunification services as much as one we

might have hoped, or seemed less capable than the available foster parent or other family member." (*M.G.*, at p. 660.)

"We review the evidence most favorably to the prevailing party and indulge in all legitimate and reasonable inferences to uphold the court's ruling. [Citation.] '"Substantial evidence" is evidence of ponderable legal significance, evidence that is reasonable, credible and of solid value. [Citation.]' [Citation.] 'Inferences may constitute substantial evidence, but they must be the product of logic and reason. Speculation or conjecture alone is not substantial evidence.'" (*Tracy J. v. Superior Court* (2012) 202 Cal.App.4th 1415, 1424.)

Here, sufficient evidence supported the court's determination that it would be detrimental to return the child to mother's custody. The court found true the b-1 allegation that there was a substantial risk that the child would suffer serious physical harm due mother's abuse of controlled substances. Mother said she had started smoking marijuana at age 15 and escalated to using methamphetamine and cocaine. She had used 10 times a week. Mother admitted using methamphetamine, cocaine, and marijuana a week before giving birth. She tested positive for methamphetamine and marijuana right after the birth, and mother later reported she had smoked marijuana once or twice since giving birth.

Although mother had completed an outpatient substance abuse program, she was expected to participate in an aftercare program as well. Mother started aftercare services but discontinued participation. She failed to complete the hair follicle test ordered by the court and failed to participate in random drug testing. The last negative drug test the

20

department had on record for mother was from October 29, 2019, only about six months after the filing of the petition and over a year before the court terminated mother's reunification services. Thus, mother's failure to participate in aftercare services and drug testing supported the court's termination of reunification services.

Moreover, the court also found true the b-9 allegation that there was a substantial risk that the child would suffer serious physical harm due mother's history of domestic violence. After that finding, father was sentenced to jail for infliction of corporal injury to a spouse. Still later, both father and mother were arrested for felony infliction of corporal injury after an incident with each other. Yet, mother continued to be involved in a relationship with father, even apparently living with him. Thus, mother's continued involvement with father, with whom she had engaged in domestic violence, supported the court's termination of reunification services.

Furthermore, mother never progressed to unsupervised visitation. In fact, mother was late to visits and missed some visitation entirely. Mother also failed to cooperate with the social worker despite repeated efforts to conduct the court ordered home evaluation. During the last reporting period, mother failed to comply with the medication monitoring component of her case plan, and she never submitted any evidence that she had engaged in or had completed individual counseling. Thus, there was substantial evidence of detriment to support the court's order terminating mother's reunification services.

21

## III.  DISPOSITION

The petition is denied.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER
Acting P. J.

We concur:

SLOUGH
J.

RAPHAEL
J.

22